AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

JUN 0 5 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of <br><br> *(Briefly describe the property to be searched or identify the person by name and address)* <br><br> Garmin Nuvi GPS 1490 <br> S/N: 1Q0062736 <br> FPF#: 2019565100003501-0006 | ) <br> ) <br> ) <br> ) Case No. <br> ) <br> ) **19MJ2349** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachement A-7

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 8 USC 1324(a)(2)(B)(ii) & 18 USC 2 - Attempted Bringing in Aliens for Financial Gain; | 8 USC 1324(a)(1)(A)(i) & (v)(II) - Attempted Bringing in Aliens Without Presentation; 8 USC 1324(a)(1)(A)(ii) & (v)(I) - Conspiracy to Transport Aliens; 8 USC 1325(a)(1) & 18 USC 2 - Attempted Improper Entry & Aiding & Abetting |

The application is based on these facts:
See Affidavit of Roland V. Negal, Jr., Border Patrol Agent - Intelligence
*Nejal*

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*
*Nejal*
Roland V. Negal, Jr., Border Patrol Agent - Intelligence
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/5/19

_____
*Judge's signature*

City and state: San Diego, CA

The Honorable William V. Gallo, Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

*Nejal*

I, Roland V. Negal Jr., U.S. Border Patrol Agent, after being duly sworn, state:

**INTRODUCTION**

1.     I make this affidavit in support of applications for warrants for six (6) cellular phones and two (2) Global Positioning Satellite ("GPS") devices seized from a February 8, 2019 maritime human smuggling event.  These cellular phones and GPS devices are described as follows:

     a.    Black Doppio Cellular Phone
            IMEI: 352897084359861
            FPF#: 2019565100003501-0001
            ("Target Phone 1")

     b.    Black Samsung Cellular Phone
            IMEI #: 35073065603945
            Owner: Arturo MEDINA-Moreira
            FPF#: 2019565100003502-0001
            ("Target Phone 2")

     c.    Black NYX Cellular Phone
            IMEI: 35253309459477
            Owner: Arturo MEDINA-Moreira
            FPF#: 2019565100003502-0002
            ("Target Phone 3")

     d.    White/Red Senna Cellular Phone
            IMEI: 352546096125527
            Owner: Danny CHULIM-Coli
            FPF#: 2019565100003503-0002
            ("Target Phone 4")

     e.    Black ZTE Cellular Phone
            SN: 320377163031
            Owner: Danny CHULIM-Coli
            FPF#: 2019565100003503-0001
            ("Target Phone 5")

f.   Black Alcatel Cellular Phone
     IMEI: 015109004653533
     Owner: Fernando MORALES-Cruz
     FPF#: 2019565100003516-0001
     ("Target Phone 6")

g.   Garmin Nuvi GPS 1490
     S/N: 1Q0062736
     FPF#: 2019565100003501-0006
     ("Target GPS Device 1")

h.   Garmin GPS Map 172C
     SN: 65811928
     FPF#: 2019565100003501-0004
     ("Target GPS Device 2")

further described in Attachments A-1 through A-8, respectively, and incorporated herein by reference. These devices currently are in the possession of San Diego Sector Asset Forfeiture Office at the Chula Vista Border Patrol Station, located at 311 Athey Ave, San Ysidro, California 92173.

2.   I seek authority to search the **Target Phones 1 through 6** and **Target GPS Devices 1 through 2** for evidence of illegal activity, described more fully in Attachment B (incorporated herein by reference), for violations of: Title 8, United States Code, Section 1324(a)(2)(B)(ii) and Title 18, United States Code, Section 2 -- Attempted Bringing in Aliens for Financial Gain and Aiding and Abetting; Title 8, United States Code, Sections 1324(a)(1)(A)(i) and (v)(II) -- Attempted Bringing In Aliens Without Presentation and Aiding and Abetting; Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) – Conspiracy to Transport Aliens in the United States; and, Title 8, United States Code, Section § 1325(a)(1) and Title 18, United States Code, Section 2 -- Attempted Improper Entry and Aiding and Abetting. I seek authority to search **Target Phone 1 and Target GPS Devices 1 and 2** from March 1, 2018 (when Jorge Luis Gomez-Espinoza, the pilot of a vessel with smuggled aliens, claimed he began smuggling aliens for a human smuggling organization) through February 9, 2019 (the date after the apprehension). I seek authority to search **Target Phones 2 through 6** from January 1, 2019 (the approximate date that the

2

1   majority of the smuggled aliens began their communications to be smuggled into the
2   United States) through February 9, 2019 (the date after the apprehension).

3       3.    Because this affidavit is being submitted for the limited purpose of
4   establishing probable cause in support of the applications for search warrants, it does not
5   set forth every fact that others or I have learned during the course of this investigation.
6   Dates, times and amounts are approximate.

7                     **EXPERIENCE AND TRAINING**

8       4.    I am a Border Patrol Intelligence Agent employed by the U.S. Department of
9   Homeland Security ("DHS"), Customs and Border Protection. I have been employed as a
10  Border Patrol Agent for approximately ten years. Currently, I am assigned to the San Diego
11  Sector Intelligence Unit – San Clemente Station Intelligence Team. I am a graduate of the
12  Federal Law Enforcement Training Center ("FLETC").

13      5.    I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of
14  the Federal Rules of Criminal Procedure, that is, a government agent engaged in the
15  enforcement of the criminal laws of the United States, and thereby authorized to request
16  issuance of federal search and seizure warrants. I am empowered to conduct investigations
17  of, and to make arrests for, federal offenses.

18      6.    As a Border Patrol Intelligence Agent, my primary duties include the
19  investigation of criminal immigration-related violations under Title 8 of the United States
20  Code. I investigate violations of the United States Code, including alien smuggling or
21  human trafficking and illegal entries within the Southern District of California. I have
22  spoken with other agents with extensive experience in human smuggling investigations.

23      7.    I have arrested or participated in the arrest of numerous persons for violations
24  under Title 8 of the U.S. Code. In these cases, I have conducted interviews with the arrested
25  persons and their associates, as well as cooperating individuals and informants. I have
26  conducted surveillance of human smugglers while operating inside the United States.
27  Through these investigative activities, I have gained a working knowledge and insight into
28  the typical activity of human smuggling organizations, and the structure of their networks.

I also have gained information as to the normal operational habits of persons who make their living as human smugglers. Through 2018 and present, I have been deeply involved in the emerging maritime threat of smugglers utilizing "pangas" (Mexican fishing vessels) and pleasure craft vessels to smuggle undocumented aliens and/or narcotics into the United States. My duties include taking sworn statements from material witnesses and defendants, preparing reports for criminal and administrative cases, evidence collection, seizure of personal property, and the creation of intelligence reports.

8.   Through the course of my training, investigations, and conversations with other law enforcement personnel, defendants, and smuggled humans, I am aware that it is a common practice for: (a) human smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, and portable radios to maintain communications with co-conspirators in order to further their criminal activities; and, (b) the smuggled aliens to communicate with the human smugglers or a go-between by utilizing cellular telephones in order to further their illegal entry into the United States.   Conspiracies involved in the smuggling and trafficking of undocumented aliens generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the method and manner of the smuggling venture, arrangements of travel and payment, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators.   For example, smugglers on vessels in maritime smuggling events typically are in telephonic contact with co-conspirators immediately prior to and following the crossing into U.S. territorial waters (12 miles off the coast).   I also know that human smugglers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

9.   In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of human smuggling investigations, and the opinions stated below are shared by them.  Further, I have personal

knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

10.    Based upon my training and experience and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.    Human smugglers and smuggled aliens use "digital devices," including cellular telephones and smart electronic devices with messaging applications because these devices are mobile.  In addition, these devices allow smugglers and smuggled aliens to have instant access to telephone calls, instant messaging, text messaging, social media applications, and voice messaging.

b.    Human smugglers and smuggled aliens use their cellular telephones and smart electronic devices to communicate amongst each other to coordinate the logistics and payments related to the smuggling of the undocumented aliens into the United States and from thereon.

c.    An undocumented alien or someone closely associated with this undocumented alien may make contact using their cellular phones or smart electronic devices with an initial human smuggler while the undocumented alien is outside of the United States.  They will discuss over the phone or via a messaging application about the logistics as to how to smuggle this undocumented alien into the United States and the financial payments involved with the smuggling act.  Using the phone or a messaging application on the phone, this smuggler will work with other associates to coordinate how to smuggle this undocumented alien along with the financial payments.  Using the phone itself or a messaging application on their phone, the smuggler or associates will advise the undocumented alien or the close contact to the undocumented alien about the next steps including the meet-up point.  Using the phone or messaging application, they may discuss the method, manner and payment at that time or after successfully smuggling the undocumented alien into the United States.

d.    The undocumented aliens also will use their phones to make calls or send text messages to discuss the smuggling arrangements with the smugglers themselves, or a go-between such as a family member or close friend prior to and during the smuggling event. On making their illegal entry into the United States, the smuggled aliens may use their phones to continue to communicate with the smugglers or the go-between such as a family member or close friend to discuss the manner and method of the smuggling activity including the payment.

e.    Human smugglers use digital devices to actively monitor the progress of their illegal cargo, i.e., the undocumented aliens, while the conveyance is in transit;

f.    Human smugglers and their co-conspirators use cellular/mobile telephones and smart devices because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations both in Mexico, international waters and in the United States;

g.    Human smugglers use digital devices to direct the human smuggler pilots of boats and drivers of cars to synchronize an exact drop off or pick up time of their illegal cargo;

h.    Human smugglers use digital devices to notify or warn their co-conspirators of law enforcement activity, and in particular Custom and Border Protection (CBP) enforcement activity, to include the presence and posture of marked and unmarked units, as well as the operational status of law enforcement checkpoints.

i.    Human smugglers use digital devices to coordinate with stash house operators regarding the logistics of housing the people they are smuggling, such as the time the smuggled people will be dropped off or picked up, a description of the vessel or vehicle transporting the smuggled undocumented aliens, the number of persons in transit, the anticipated duration of their stay, and how much and when the stash house operator will be paid.

j.    Human smugglers often keep the names, addresses, and telephone numbers of their associates on their digital devices. Human smugglers often keep records

of meetings with associates on their digital devices, including in the form of calendar entries and location data, such as GPS information, other locational information, and identifying information about the smuggler and co-conspirators and the location of previous human smuggling transactions or stash houses, and/or the identity or whereabouts of smugglers and co-conspirators involved in human smuggling.

k.    Subscriber Identity Module (SIM) cards also known as subscriber identity modules are smart cards that store data for certain cellular telephone subscribers. Such data includes user identity, phone number, network authorization data, personal security keys, contact lists, stored text messages. Dependent on the cellular device, information on a SIM cards can be collected as evidence as to the operator use of that particular cellular telephone. SIM cards may be transferrable between different cellular/mobile telephones. Human smugglers and their co-conspirators will replace the SIM (memory) cards in their cellular or mobile phones as a means to avoid detection.

11.    Based upon my training and experience, consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones and SIM cards may and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones.

12.    Based on my research, training, and experience, as well as conversations with other law enforcement personnel who have experience with GPS devices in maritime human and narcotics smuggling events, I know the following facts:

a.    **Target GPS Device 1** and **Target GPS Device 2** were located inside the seized vessel, which most likely means they were utilized as navigation tools at some point for a smuggling operation.

1    b.    A GPS device is a satellite-based navigation system made up of a
2 network of satellites placed into orbit by the U.S. Department of Defense. GPS works in
3 any weather conditions, anywhere in the world, 24 hours a day.

4    c.    GPS satellites circle the earth and transmit signal information to earth.
5 GPS receivers take this information in order to calculate the user's exact location.
6 Essentially, the GPS receiver compares the time a signal was transmitted by a satellite with
7 the time it was received. The time difference tells the GPS receiver how far away the
8 satellite is. With distance measurements from a few satellites, the receiver can determine
9 the user's position and display it on the unit's electronic map.

10    d.    A GPS receiver must be locked on to the signal of a satellite to calculate
11 a 2D position (latitude and longitude) and track movement. With four or more satellites in
12 view, the receiver can determine the user's 3D position (latitude, longitude and altitude).
13 Once the user's position has been determined, the GPS unit can calculate other information,
14 such as speed, bearing, track, trip distance, distance to destination, sunrise and sunset time
15 and more.

16    e.    GPS Devices typically contain a feature that displays the vessel's
17 journey. GPS devices typically contain "way points," which are navigational points
18 programmed into the GPS to assist the pilot in navigating to particular destinations.

19 **FACTS AS TO THE ALIEN SMUGGLING EVENT**

20    13.    According to a report prepared by Border Patrol Agent Manglio Garcia, on
21 February 8, 2019 at approximately 10:10 a.m., Agent Garcia was operating a camera along
22 the coastline of San Diego, California. Agent Garcia observed a vessel travel in a general
23 northerly direction, approximately four nautical miles south of the maritime boundary line
24 that separates Mexico and the United States. At approximately 10:40 a.m., Agent Garcia
25 observed the vessel cross north of the boundary line. Agent Garcia observed the vessel as
26 it made its way north past Imperial Beach, California. As Agent Garcia observed the vessel
27 pass Point Loma, California, he identified the vessel as a 30 to 35 foot white cubby cabin
28

8

1    with a blue Bimini top – generally, a pleasure craft.  At approximately 12:00 p.m., Agent
2    Garcia contacted the United States Coast Guard ("USCG") for assistance.

3        14.    USCG launched its own boat to intercept the vessel.  At approximately 12:52
4    p.m., USCG spotted and verified the vessel matched the lookout.    The USCG vessel
5    intercepted the vessel at approximately 2.5 nautical miles west of La Jolla, California.  The
6    vessel was identified as a 36-foot sport fishing vessel.

7        15.    Using the Spanish language, USCG officers notified the individuals on the
8    vessel that they were going to board it for a safety inspection. USCG officers then boarded
9    the vessel. The officers initially encountered ten individuals on board. The operator, later
10   identified as Jorge Luis Gomez-Espinoza ("Gomez-Espinoza"), stated that there were other
11   individuals on the vessel.  The officers continued their safety sweep and encountered an
12   additional 13 persons. In the end, USCG encountered a total of 23 persons on the vessel.
13   These individuals were identified as: Jorge Luis Gomez-Espinoza; Jesus Medina-Espinoza;
14   Daniel Chulim-Colli; Javier Espinoza-Lopez; Julio Esquivel; Amado Hernandez-Garcia;
15   Elpidio Juarez-Soriano; Ernesto Ledesma-Ledesma; Araceli Martinez-Cedillo; Julian
16   Martinez-Hernandez; Tonny Emmanuel Martinez-Martinez; Arturo Medina-Moreira;
17   Humberto Medina-Moreira; Fernando Morales-Cruz; Jorge Quintana-Llamas; Omar
18   Sanches-Martinez also known as Floriberto Resendiz-Ledesma; Cecilia Santiago-
19   Crisostomo; Ernesto Manuel Saucedo-Hernandez; Jose Venacio-Hernandez; Gilberto
20   Zapata-Hernandez; Sergio Nava-Ayala; Guadalupe Jaimes-Renteria; and, A.C.F., a minor.

21       16.    During this inspection, Jorge Luis Gomez-Espinoza stated that they were
22   coming from Rosarito, Mexico and were on a joyride.  Gomez-Espinoza stated that the
23   owner of the boat was not present and that all persons on board were Mexican Nationals.

24       17.    USCG officers then transferred the 23 subjects onto USCG Cutter Robert
25   Ward.  These individuals were transported to Ballast Point Pier in Point Loma, California
26   to meet with immigration officials.

27       18.    According to a report prepared by Border Patrol Agent Jose Heredia, at
28   approximately 4:00 p.m., Agent Heredia met with USCG officers at the Point Loma Naval

Base Station. USCG Officers notified Agent Heredia that two subjects, i.e., Jorge Luis Gomez-Espinoza and Jesus Medina-Espinoza, were suspected as the principals in the maritime smuggling event. Agent Heredia proceeded to question each individual as to their country of citizenship, if they possessed proper immigration documents and if they were in the United States legally. Based on those responses, Agent Heredia determined each person was a citizen of Mexico without proper immigration documents to enter or remain in the United States. All 23 individuals were arrested for an illegal entry and then transported to the San Clemente Border Patrol Station for processing.

19.    In the meantime, according to a report prepared by Supervisory Marine Interdiction Agent Reif A. Smith, around 4:00 p.m., Agent Smith conducted a search of the seized vessel at Ballast Point. Agent Smith stated that one of the USCG boarding team members led him to the main saloon, which contains the helm area. Agent Smith observed two phones and a black bag with a handheld smaller GPS device on the chart table. Agent Smith placed those items in a brown evidence bag and handled it over to Border Patrol.

20.    Agent Smith continued with his search and went into the small cabin area where several of the smuggled aliens originally were located. In a drawer underneath the bunk beds, Agent Smith located a small bag full of phones (collectively referred to as the "segregated phones"). Based on my training and experience and conversations with other law enforcement officers, it is common practice for smugglers to collect the cellular phones of the undocumented aliens during the smuggling event. This is to ensure that the human smugglers have full and complete control over the smuggled aliens, i.e., their illegal cargo. This ensures that the smuggled aliens cannot contact family members, close associates or even law enforcement. Agent Smith subsequently placed the segregated phones into a separate evidence bag and provided the two bags to Border Patrol.

21.    On receipt of those evidence bags at the San Clemente Border Patrol Station, Border Patrol Agent – Intelligence Miguel Quintero identified one evidence bag as containing **Target Phone 1 and Target GPS Devices 1 and 2**. He also identified the segregated phones as containing 22 phones – including **Target Phones 2 through 6** -- in

1 the other evidence bag. Agent Quintero along with Border Patrol Agent A. Burke tried to
2 ascertain the owners of the various devices by speaking with the various individuals
3 apprehended during the event. Agent Quintero also identified a 24th phone, and noted that
4 this phone was not in the evidence bags but was next to those bags. This phone was
5 identified as a Black Samsung Galaxy Note 8, IMEI: 358503085817329 (the "Black
6 Samsung"). During an April 18, 2019 proffer session at the U.S. Attorney's Office in San
7 Diego, California, Jorge Luis Gomez-Espinoza identified the Black Samsung as his phone.
8 Gomez-Espinoza provided consent to search the Black Samsung phone; however, the
9 agents have not received further information yet from the Black Samsung.

10     22.    At the San Clemente Border Patrol Station, all 23 subjects were processed by
11 law enforcement officers and interviewed.

12 **Jorge Luis Gomez-Espinoza:**

13     23.    As to Jorge Luis Gomez-Espinoza, he was interviewed by Border Patrol
14 Agent Leopoldo Sanchez and Homeland Security Investigations Special Agent Kerstyn
15 Kowalski. Gomez-Espinoza was read his constitutional rights per *Miranda*, stated he
16 understood those rights, and agreed to speak with the agents. Gomez-Espinoza initially
17 claimed that he was to receive a discount towards his smuggling fee for driving the boat.
18 Once he beached the boat, he was going to reach out to his aunt via Facebook and make
19 living arrangements. Agents confronted Gomez-Espinoza with their knowledge that
20 individuals usually make arrangements with their relatives prior to the smuggling event
21 and that they thought he was lying. Gomez-Espinoza then explained that a friend
22 introduced him to an individual named Juan. He said that Juan mentioned that he smuggled
23 aliens and would give him (Gomez-Espinoza) a job. Gomez-Espinoza said that he needed
24 the money in order to provide for his family. Gomez-Espinoza said that Juan asked him if
25 he knew how to drive a boat. Gomez-Espinoza said that he was a fisherman and knew how
26 to drive pangas. He then claimed that Juan told him that he would receive a call at a later
27 date. Gomez-Espinoza then explained that he did, in fact, receive a call from Juan and was

28

11

1  instructed to meet him on Thursday (which would be February 7, 2019). Gomez-Espinoza
2  said that he recruited his cousin Jesus Medina-Espinoza.

3      24.    According to Gomez-Espinoza, Gomez-Espinoza and Medina-Espinoza then
4  drove to Ensenada on Wednesday (which would be February 6, 2019). The following
5  morning, they had breakfast and met up with Juan at the pier in Ensenada. Gomez-
6  Espinoza said that Juan then gave him instructions pertaining to the smuggling event. He
7  instructed Gomez-Espinoza to drive the boat to an unknown location near Ensenada to pick
8  up people. He then was going to smuggle those people into the United States. Gomez-
9  Espinoza said that he was shown a location in a map on his phone. Gomez-Espinoza then
10 was instructed to drive the boat to the Coronado Islands and wait until the following
11 morning to pilot the boat into the United States. He was told to do it this way so that they
12 could blend in with the other boats. Gomez-Espinoza later clarified that Medina-Espinoza
13 was instructed to pick up another boat, drive it to the Coronado Islands and then meet with
14 Gomez-Espinoza at that location.

15     25.    Gomez-Espinoza explained that, at some point, Juan was going to call him
16 (from a 661 Mexican area code) and tell him where to land the boat. Gomez-Espinoza also
17 explained that the tentative landing point was going to be in San Clemente or Dana Point.
18 He said that the final location would be determined if the area was deemed clear of law
19 enforcement. Had they been successful in the smuggling venture, Gomez-Espinoza and
20 Medina-Espinoza were supposed to drive the boat back to Ensenada. Gomez-Espinoza
21 said that he was going to be paid approximately $300 for each smuggled alien. He planned
22 to pay half of the amount to Medina-Espinoza.

23     26.    Gomez-Espinoza subsequently was charged with 21 counts of Attempted
24 Bringing In Aliens for Financial Gain and Aiding and Abetting, in violation of 8 U.S.C. §
25 1324(a)(2)(B)(ii) and 18 U.S.C. § 2, among other charges in criminal case number
26 19CR0817-W in the U.S. District Court for the Southern District of California. On April
27 2, 2019, Gomez-Espinoza pled guilty to one-count of Attempted Bringing in for Financial
28 Gain, which carries a three-year mandatory minimum, subject to a plea agreement under

criminal case number 19CR0817-W. As part of the plea agreement, Gomez-Espinoza agreed to the administrative and civil forfeiture of all property seized as to this smuggling event.

27.    On April 18, 2019, Gomez-Espinoza and his defense counsel met with Assistant U.S. Attorney Charlotte E. Kaiser, Border Patrol Agent – Intelligence Steve Vargas, Border Patrol Agent J. Pineda and Air and Marine Interdiction Agent J. Varhola as well as a Spanish interpreter at the U.S. Attorney's Office in San Diego, California. Gomez-Espinoza signed a proffer agreement and was advised to tell the truth and that it was a crime to lie to federal agents.

28.    Gomez-Espinoza initially claimed that he became involved in the smuggling of aliens in November 2018. He said that he became involved through his friends "Juan" and "Ivan." He said that Juan and Ivan both live in Baja California, Mexico. He explained how he approached Ivan, who is a boat captain, about making money. Sometime between November 10 and 12, 2018, Gomez-Espinoza received a call on his phone from Ivan. At that time, Gomez-Espinoza claimed that he told Ivan that he was willing to engage in alien smuggling. Ivan then directed him to go to Ensenada and provided him with $200 U.S. for gas and food. Gomez-Espinoza said that he arrived in Ensenada around November 14, 2018. There, Juan picked him up in a white BMW and then went to a pier named "El Sauzal." Gomez-Espinoza saw several boats there. He said that Juan and he went on a yacht to see if it worked. After they determined it worked, Gomez-Espinoza confirmed that he wanted to smuggle. He said that he would be Ivan's helper so that he could learn the smuggling route. Gomez-Espinoza said that, on the next day, they left El Sauzal at around 6 to 7 a.m. with two smuggled aliens on the boat. Gomez-Espinoza said that they arrived in San Diego, California near a white building. They dropped off the two smuggled aliens by giving them life vests and surfboards.  They told the smuggled aliens to use the password "Estrella" for individuals waiting for them on the shoreline.

29.    Gomez-Espinoza claimed that he tried smuggling again the following two weeks thereafter. He said that they dropped off three smuggled aliens at the same location

in San Diego, California during both trips.  He said that Ivan was the pilot during those two other trips.

30.     Around this time of his discussion of events, Gomez-Espinoza was asked when was the last time he entered the United States before the November 2018 smuggling events.  Gomez-Espinoza claimed that he had last entered when he was 10 or 11 years-old.  However, this information conflicted with information Border Patrol received from law enforcement officers working in the Newport Beach area.  Specifically, in March 2018, local law enforcement officers encountered Gomez-Espinoza after what appeared to be a smuggling event in Newport Beach, California.  Agent Vargas then showed Gomez-Espinoza a photograph that the local officers took of Gomez-Espinoza during that encounter.  On seeing the photograph, Gomez-Espinoza admitted that he was the person in the photograph and that the encounter happened in early 2018.  After that admission, Gomez-Espinoza met with his defense counsel outside the presence of the other attendees for a few minutes.  Then, the defense counsel called the other attendees back into the meeting.

31.     After being confronted with this discrepancy, Gomez-Espinoza apologized for lying and claimed that he was scared how his actions would impact him.  He was admonished not to lie again.  Gomez-Espinoza then said that he did not think the Newport Beach encounter would show-up in law enforcement records because the local officers did not take his fingerprints.  Gomez-Espinoza then admitted to being involved in approximately 11 smuggling boat trips.  He said that the prior events he described previously did occur but during different dates.  He maintained that he still had been recruited by Juan and Ivan.

32.     For the March 2018 Newport Beach encounter, Gomez-Espinoza said that his cousin Jesus Emmanuel Medina-Espinoza also was involved in this event.  Gomez-Espinoza said that he was going to be paid $200 to $300 per smuggled alien.  He also said that Ivan was acting as foot guide.  He said that Ivan exited the boat and stayed on shore with the six other smuggled aliens.  Gomez-Espinoza said that, after dropping off Ivan and

the other six individuals, he piloted the boat back to Mexico. However, he had been stopped by law enforcement because he was driving too fast.

33.     Gomez-Espinoza admitted that he lied to the local officers who stopped him during this Newport Beach encounter. They asked him who owned the boat, and he told them that the boat belonged to his uncle. He, however, admitted to the local officers that he did not have immigration documents. The local officers took pictures of his cousin and him and then released them. He said that they returned to Ensenada.

34.     Gomez-Espinoza then described the landing locations for the other smuggling events. Gomez-Espinoza explained that they would leave Mexico around 4 or 5 a.m., blend in with the fishermen at the border and then drop off the people around sun down. He explained how he smuggled aliens in March 2018 approximately twice. During those events, he dropped the smuggled aliens in Newport Beach, California. Gomez-Espinoza then consented to the search of his seized phone – the Black Samsung - and identified the GPS coordinates for this area as 33.6171552, -117.9041620. Gomez-Espinoza then explained how, approximately three times in April and May 2018, Ivan and he dropped off smuggled aliens in Mission Bay in San Diego, California. Based on the information from the Black Samsung, the GPS coordinates for this location was 32.7584964, -117.2425799.

35.     Gomez-Espinoza explained that the subsequent smuggling events took place between August 2018 and February 2019. Both Ivan and he dropped off several smuggled aliens in Encinitas, California with GPS Coordinates 33.087432, -117.3134464, in Mission Bay, California, and Oceanside, California with GPS Coordinates 33.2147984, -117.4004586. Gomez-Espinoza explained that, for the ninth event, his brother Oscar Gomez, assisted him. He said that, after dropping off the smuggled aliens, they were stopped by the Coast Guard but subsequently released.

36.     Gomez-Espinoza said that he was paid $200 to $300 per person. He claimed that he smuggled approximately 60 people total between March 2018 and the date of his apprehension on February 8, 2019. He thought that he used three different types of boats. Gomez-Espinoza said that he eventually would take Ivan's place in the smuggling

organization. He also said that, during the events, there always would be someone waiting for the smuggled aliens at the drop-off location.

37.    For the last smuggling event in February 2019 in which Gomez-Espinoza was arrested, Gomez-Espinoza had been told that there were two other people on the boat who were not going to pay the smuggling fees. However, he did not know who they were. He also addressed why the majority of the seized phones had been in one bag – i.e., the segregated phones. Gomez-Espinoza explained that it was so that there would be no communications from the smuggled aliens during the journey. He said that, once they would arrive at their destination, he would provide the bag to one of the smuggled aliens. Gomez-Espinoza said that he did not see the smuggled aliens use their phones during this last encounter.

38.    During the smuggling events, Gomez-Espinoza said that he would be in contact with Juan at all times via his phone. He said that he would communicate via texts including WhatsApp and voice calls. He claimed that Juan changed his number frequently. Gomez-Espinoza also said that Juan told him that, if Gomez-Espinoza spoke with the authorities, Juan would find out. Gomez-Espinoza said that he took this statement as a threat.

**Jesus Medina-Espinoza:**

39.    As to Jesus Medina-Espinoza, on or about the date of his apprehension, he was interviewed by Border Patrol Agent Steve Vargas and Marine Interdiction Agent Jeremy Varhola. Medina-Espinoza was read his constitutional rights per *Miranda*, stated he understood those rights, and agreed to speak with the agents. Medina-Espinoza admitted to being a citizen and national of Mexico without immigration documents to enter or remain in the United States. He said that he entered the United States via the boat and that his intention for entering was to work here. He also admitted that Gomez-Espinoza was driving the boat. Medina-Espinoza stated that he himself drove the boat for approximately two hours.

40.     Medina-Espinoza said that, three days before their arrest, Gomez-Espinoza offered him a job to bring people from Rosarito to Los Angeles. He said that he would receive a free smuggling trip in lieu of paying a smuggling fee. Medina-Espinoza said that they picked up the vessel in Rosarito, Mexico at approximately 7 a.m. the day before their arrest. He said that approximately 20 people were on the boat. They then departed at around 10 a.m. According to Medina-Espinoza, they traveled north along the shore. He admitted that he knew they were crossing illegally and that the other people on the boat did not have "papers." Medina-Espinoza said that they traveled for approximately five hours before they were arrested. Medina-Espinoza admitted that Gomez-Espinoza and he were traffickers because they both drove the boat.

41.     Medina-Espinoza was charged in the same Information with Gomez-Espinoza in criminal case number 19CR0817-W. On April 2, 2019, Medina-Espinoza pled guilty to one-count of Attempted Bringing In Aliens without Presentation, in violation of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(II) subject to a plea agreement. As part of the plea agreement, Medina-Espinoza agreed to the administrative and civil forfeiture of all property seized as to this smuggling event.

**Arturo Medina-Moreira:**

42.     On or about February 9, 2019, Arturo Medina-Moreira was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He said that, on or about January 25, 2019, he arrived in Tijuana from San Luis Potosi, Mexico. On his arrival, his uncle arranged for his brother and him to be smuggled by boat into the United States for $13,000. He said that his uncle told him to meet the smuggler at a local hotel near the center of town in Tijuana. He said that his brother and he waited for 15 days in the hotel until they finally received a phone call on February 7, 2019 in which they were told to get ready to leave. Arturo Medina-Moreira said that they then met a man outside of their hotel. This man took them on a bus to Ensenada. On arrival, they walked to a shoreline where they met up with other people near a panga. Arturo Medina-Moreira said that they were told to get into the

boat. He said they traveled in the boat for approximately 10 minutes before they were transferred to a bigger boat. Arturo Medina-Moreira claimed that they were in the boat for approximately 16 hours before they were arrested. Medina-Moreira identified **Target Phones 2 and 3** from the segregated phones as his phones.

**Daniel Chulim-Colli:**

43.     On or about February 9, 2019, Daniel Chulim-Colli was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He said that, in January of this year, he was ordered deported and was removed. He tried to return illegally to his family here in the United States. He said that, after his removal to Ciudad Juarez, he made a friend there. This friend made his smuggling arrangements for him. He said that he was going to pay $14,000 as his smuggling fee. He and his friend then flew from Ciudad Juarez to Tijuana. In Tijuana, they stayed at a hotel until they received a phone call from the smuggler. He said that the smuggler told them the boat was ready. They then took a bus to Ensenada. On arrival, they were transported to a remote beach with a jetty. There, they met the rest of the group. He said that they walked to the end of the jetty and waited for approximately 20 minutes. Then, they boarded a boat. Once out at sea, they transferred to another boat. Chulim-Colli identified **Target Phones 4 and 5** from the segregated phones as his phones.

**Fernandez Morales-Cruz:**

44.     On or about February 9, 2019, Fernando Morales-Cruz was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. Morales-Cruz said that he was deported after being convicted for driving under the influence. He said that he was deported to Tijuana the week prior to his instant arrest. Once he arrived, he stayed at a hotel. While in downtown Tijuana, he arranged to be smuggled into the United States for $13,000. He said that, during a phone call, someone told him to travel via public transit to Ensenada, Mexico. So, he took a bus there, where he then went to a beach. He was met by some men who took him to a location where he boarded a small boat. He said that they subsequently

1 | were transferred to a larger boat.    Morales-Cruz identified **Target Phone 6** from the
2 | segregated phones as his phone.

3 | **Araceli Martinez-Cedillo:**

4 |     45.    On or about February 9, 2019, Araceli Martinez-Cedillo was interviewed as a
5 | material witness. She admitted to being a citizen and national of Mexico without legal
6 | documents to enter or remain in the United States. She stated that she knew she was making
7 | an illegal entry. She said that her cousin arranged for them to be smuggled into the United
8 | States. She initially stayed at a hotel with the cousin in Tijuana. They then took a taxi to
9 | Ensenada where they boarded a boat. She said that, while out at sea, they boarded a larger
10 | boat. Martinez-Cedillo identified two of the other phones from the segregated phones as
11 | her phones.

12 | **Omar Sanches-Martinez:**

13 |     46.    On or about February 9, 2019, an individual originally identified as Omar
14 | Sanches-Martinez was interviewed as a material witness. He later claimed that his true
15 | name was Floriberto Resendiz-Ledesma. In any event, at all times according to the
16 | apprehension report for this event, he admitted to being a citizen and national of Mexico
17 | without legal documents to enter or remain in the United States. He said that he previously
18 | lived in Escondido, California. He, however, returned to Mexico due to a family matter.
19 | He said that he intended to return to Escondido. And so, he traveled from Queretaro to
20 | Tijuana, where he agreed to pay a smuggling fee of $13,000 to be returned to the United
21 | States. He said that he spent two weeks in a hotel in Tijuana. He then was told by
22 | smugglers to take a taxi to a location in Ensenada, Mexico where he would board a boat
23 | there. Once he arrived there, he boarded a small boat. He said that he and the other
24 | occupants then transferred to a larger boat. Sanches-Martinez / Resendiz-Ledesma
25 | identified two of the other phones from the segregated phones as his phones.

26 | **Tonny Emmanuel Martinez-Martinez:**

27 |     47.    On or about February 9, 2019, Tonny Emmanuel Martinez-Martinez was
28 | interviewed as a material witness. He admitted that he previously used an alias of Hugo

1  Flores-Martinez.  He admitted to being a citizen and national of Mexico without legal
2  documents to enter or remain in the United States.  He said that he arranged to be smuggled
3  into the United States by boat for $15,000.  He said the payment was due on arrival.  He
4  said that he stayed at an unknown hotel in Tijuana.  He then took a taxi to Ensenada.  He
5  said that four men there told him to board a boat.  He said that the boat left the evening
6  before their arrest.  While out at sea, they transferred to a larger boat.  Martinez-Martinez
7  identified one of the phones from the segregated phones as his phone.

8  **Ernesto Ledesma-Ledesma:**

9       48.   On or about February 9, 2019, Ernesto Ledesma-Ledesma was interviewed as
10 a material witness.  He admitted to being a citizen and national of Mexico without legal
11 documents to enter or remain in the United States.  He admitted to being apprehended three
12 other times for illegal entry.  He said that he knew he was making an illegal entry this time
13 around.  He claimed that he took a plane from Queretaro to Tijuana.  On his arrival, he
14 stayed with friends.  He said that those friends made the smuggling arrangements on his
15 behalf.  He said that he was going to pay $13,000 to be smuggled into the United States.
16 He said that the smugglers then picked him up and drove him to Ensenada.  He said that a
17 boat came close to the jetty and he and approximately 20 other people jumped on board.
18 While out at sea, they transferred to another boat.  Ledesma-Ledesma identified one of the
19 phones from the segregated phones as his phone.

20 **Gilberto Zapata-Hernandez:**

21      49.   On or about February 9, 2019, Gilberto Zapata-Hernandez was interviewed as
22 a material witness.  He admitted to being a citizen and national of Mexico without legal
23 documents to enter or remain in the United States.  He said that he had been living in
24 Georgia since 2002 prior to his arrest.  On December 29, 2018, he traveled to Juarez,
25 Mexico to obtain a visa for legal entry into the United States.  He, however, was advised
26 that he was ineligible for admission.  This happened in early January 2019.  He then
27 overheard two men discussing returning to the United States illegally.  He approached these
28 men.  One of them told him that he could get him in contact with a smuggler.  Zapata

1  claimed that he then spoke with the smuggler but that the smuggler told him it was too cold
2  to cross by a boat.

3       50.    Zapata then explained that he traveled to his home town in Mexico to visit his
4  parents for 15 days. At some point, he then contacted the smuggler only to be told that the
5  weather was not right. He then went to visit his daughter. Around that time, the smuggler
6  contacted him and told him to come to Tijuana. Zapata then arrived in Tijuana around
7  Thursday, February 7, 2019 via plane. He was taken to an apartment and spent the night
8  there. He then was picked up the next day where he was in a truck ride for about an hour.
9  He then came to a beach where the driver of truck told him to get on a boat. He said that
10 he along with 20 other people boarded the boat. He said that two other male subjects
11 already were on the boat. Zapata said that he thought he was going to pay between $7,000
12 and $13,000 to be smuggled back into the United States. He reviewed a photographic line-
13 up and identified Medina-Espinoza as one of the boat drivers. Zapata also identified one
14 of the phones from the segregated phones as his phone.

15 **Ernesto Manuel Saucedo-Hernandez:**

16      51.    On or about February 9, 2019, Ernesto Manuel Saucedo-Hernandez was
17 interviewed as a material witness. He admitted to being a citizen and national of Mexico
18 without legal documents to enter or remain in the United States. He admitted that,
19 approximately two years before his instant arrest, he had been ordered deported, excluded
20 or removed from the United States. He said that he knew it was illegal to re-enter the
21 United States after removal and that he came back in order to find work. He said that they
22 left on a boat on February 7, 2019, but then were transferred to another boat within a half-
23 hour of their departure. He said that he made smuggling arrangements with a friend he
24 identified by name. He said that this friend spoke with the guide. He claimed that he was
25 going to pay $8,500 to be smuggled into the United States. Saucedo-Hernandez identified
26 one of the phones from the segregated phones as his phone.

27 //

28 //

**Jorge Manuel Quintana-Llamas:**

52. On or about February 9, 2019, Jorge Manuel Quintana-Llamas was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He said that he previously was deported in September 2018. He said that he previously committed an illegal entry through the mountains near Tecate, Mexico in 2008. He admitted to knowing it was illegal to re-enter the United States after being removed. Quintana-Llamas said that he was going to pay a $7,000 smuggling fee to be smuggled into the United States. He said that he arranged to be smuggled with an individual named Guerro. He said that they initially traveled on one boat and then transferred to another boat. Quintana-Llamas identified Gomez-Espinoza as the driver of the boat and Medina-Espinoza as someone who helped drive the boat. Quintana-Llamas identified one of the phones from the segregated phones as his phone.

**Cecilia Santiago-Crisostomo:**

53. On or about February 9, 2019, Cecilia Santiago-Crisostomo was interviewed as a material witness. She admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. She stated that she knew she was making an illegal entry. She said that she was staying in Tijuana when she overheard some people discuss being smuggled into the United States by boat. She said that she joined them. She said that she then took a bus to Ensenada and that she just followed people onto a boat. While at sea, they transferred to a larger boat. Santiago-Crisostomo identified one of the phones from the segregated phones as her phone.

**Julian Martinez-Hernandez:**

54. On or about February 9, 2019, Julian Martinez-Hernandez was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He said that, on January 16, 2018, he flew to Tijuana from Oaxaca, Mexico. Shortly on arriving in Tijuana, he made arrangements with an unknown man he called "El Chapparo" to be smuggled into the

22

1   United States.  He said that he was going to pay $8,000 as a smuggling fee.  He initially
2   was trying to cross over the land but had a difficult time doing so.  So, El Chapparo told
3   him to go to Ensenada to be smuggled on a boat.

4       55.   On February 8, 2019, Martinez-Hernandez took a taxi from Tijuana to
5   Ensenada.  He was told to go to a store called "3 Hermanos" and then to the shoreline
6   where he would see people ready to be smuggled.  When Hernandez-Martinez arrived at
7   the shoreline, he said that he saw approximately 11 people there.  The group then walked
8   south and came across another group already in a boat.  Hernandez-Martinez was told to
9   get into the boat.  He said that they traveled approximately one hour in that boat before
10  they transferred to a different boat.  Martinez-Hernandez identified one of the phones from
11  the segregated phones as his phone.

12  **Julio Cesar Esquivel-Ruelas:**

13      56.   On or about February 9, 2019, Julio Cesar Esquivel-Ruelas was interviewed
14  as a material witness. He admitted to being a citizen and national of Mexico without legal
15  documents to enter or remain in the United States.  He stated that he knew he was making
16  an illegal entry.  He admitted to being voluntarily removed approximately three times
17  before his instant arrest.  He said that a known associate put him in contact with the man
18  who smuggled him into the United States. He said that, on Thursday morning, he met with
19  this smuggler in Ensenada who told him that he would travel by boat.  He said that the
20  smuggler told him that he would have to pay $13,000.  He was to pay the money to the
21  pick-up crew.  He said that he was instructed to wait around town until boarding a bus.
22  The bus took him to a stop where he then got picked up by a man driving a Ford Expedition.
23  He said there were other people in that car.  They then traveled for 20 minutes south of
24  Ensenada.  Once they came to a stop, the driver told them to get out of the car and to walk
25  to the beach.  He said that they did so. At approximately 4 p.m., they boarded a small boat.
26  After approximately ten minutes, they boarded a bigger boat.  Esquivel-Ruelas identified
27  one of the phones from the segregated phones as his phone.

28  //

**Humberto Medina-Moreira:**

57.    On or about February 9, 2019, Humberto Medina-Moreira was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He said that he knew he was making an illegal entry into the United States.   He claimed that his uncle made smuggling arrangements for him.  He then spoke about how he spent 15 days in a hotel in Tijuana. He said that they took different buses and a van to Ensenada where they then boarded a boat. He said that the driver of the boat told him to get onto it.  He recalled transferring to a larger boat when they got out into sea.  Humberto Medina-Moreira identified one of the phones from the segregated phones as his phone.

**Javier Espinosa-Lopez:**

58.    On or about February 9, 2019, Javier Espinosa-Lopez was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States.  He admitted to being apprehended several other times for illegal entry by U.S. Border Patrol and claimed to have been voluntarily removed. He said that he lived in Santa Maria, California for several years and worked on a farm. He claimed that he left voluntarily for Mexico to visit family.  He then planned his illegal return. He said that, on the Wednesday before his arrest, he boarded a bus from Oaxaca and traveled to Tijuana. There, he met two men who told him that they would smuggle him across the border. He thought that he was going to pay $13,000 as a smuggling fee. He then spent the night at his uncle's residence in Tijuana and returned to those two men the next day. He then was driven to Ensenada, where he boarded a boat with approximately 20 other people. He said that there were two men who operated the boat.  Espinosa-Lopez identified one of the phones from the segregated phones as his phone.

**Elpido Juarez-Soriano:**

59.    On or about February 9, 2019, Elpido Juarez-Soriano was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal

1  documents to enter or remain in the United States. He said that he arranged to be smuggled
2  into the United States while he was in Tijuana. He said that he made those arrangements
3  over the phone with an unknown individual. He said that he agreed to pay $10,000 to be
4  smuggled on a boat. He said that he boarded the boat on approximately 4 p.m. the day
5  before his arrest. While out at sea, he said that they transferred to another boat. Agents
6  were unable to have Juarez-Soriano identify any of the phones as belonging to him.

7  **Amado Hernandez-Garcia:**

8  60.  On or about February 9, 2019, Amado Hernandez-Garcia was interviewed as
9  a material witness. He admitted to being a citizen and national of Mexico without legal
10  documents to enter or remain in the United States. Hernandez-Garcia said that,
11  approximately one week before his arrest, he was released from U.S. custody. He said that
12  he had been in custody in Arizona for illegal entry. On his release, Hernandez-Garcia said
13  that he and a friend went to Tijuana in order to make another illegal entry. He said that
14  they arrived around February 5, 2019. They spoke with the smuggler later that day and
15  made arrangements. He said that he planned to pay $8,000 as a smuggling fee. He said
16  that they stayed at the smuggler's home for two days before they left. They then took a
17  taxi to a beach approximately two hours away. Once they arrived at the beach, Hernandez-
18  Garcia said that they met a different smuggler. They boarded a small boat but then
19  eventually were transferred to a larger boat. Agents were unable to have Hernandez-Garcia
20  identify any of the phones as belonging to him.

21  **Other Undocumented Aliens**

22  61.  Jose Venancio-Hernandez also was identified a citizen of Mexico without
23  legal documents to enter or remain in the United States. He identified one of the phones
24  from the segregated phones as his phone. In addition, Sergio Naya-Ayala and Guadalupe
25  Jamie-Renteria also were on the boat. Both were charged with illegal re-entry, in violation
26  of 8 U.S.C. § 1326. On February 11, 2019, Magistrate Judge William V. Gallo authorized
27  a complaint on the illegal re-entry charge for Jamie-Renteria in criminal case number
28  19MJ0596-WVG. Jaime-Renteria then pled not guilty to a one-count Information for

1 | attempted illegal re-entry, in violation of 8 U.S.C. § 1326.   Jaime-Renteria previously
2 | identified one of the phones from the segregated phones as his phone.   As for Naya-Ayala,
3 | he was charged with illegal re-entry in criminal case number 19MJ0602-WVG.   On or
4 | about April 9, 2019, Naya-Ayala pled guilty to a one-count Information, charging him with
5 | attempted illegal-re-entry, in violation of 8 U.S.C. ' 1326.   He currently is awaiting
6 | sentencing.   Naya-Ayala previously identified one of the phones from the segregated
7 | phones as his phone.

8 | **Pertinent Information on the Target Phones and Devices**

9 |      62.   Based upon my experience and training, consultation with other law
10 | enforcement officers experienced in alien smuggling investigations, and all the facts and
11 | opinions set forth in this affidavit, I believe that **Target Phones 2 through 6** were used to
12 | coordinate between the smuggled aliens with human smugglers and/or their go-betweens
13 | regarding the attempted bringing in of aliens without presentation and for financial gain,
14 | and for aiding and abetting of illegal entries.   All of these phones were located in a bag (the
15 | segregated phones) that was seized from the vessel involved in the smuggling venture.
16 | This tactic of segregating the phones from the smuggled aliens shows that smugglers know
17 | smuggled aliens use their phones to communicate their whereabouts and travel
18 | arrangements.   In fact, as discussed above, many of the smuggled aliens interviewed as
19 | material witnesses explained how they arranged with human smugglers to be smuggled
20 | into the United States.   Where possible, some of them explicitly spoke about phone
21 | communications. I believe that recent calls made and received, telephone numbers, contact
22 | names, electronic mail (email) addresses, appointment dates, text messages, pictures and
23 | other digital information are stored in the memory of cellular phones and SIM cards may
24 | identify other persons – i.e., human smugglers -- involved in alien smuggling activities.
25 | Based upon my experience and training, consultation with other law enforcement officers
26 | experienced in alien smuggling investigations, and all the facts and opinions set forth in
27 | this affidavit, I believe that information relevant to the smuggling activities of Gomez-
28 | Espinoza, Medina-Espinoza and their co-conspirators, such as telephone numbers, made

and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of **Target Phones 2 through 6** described herein.

63.     Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that **Target Phone 1** and **Target GPS Devices 1 and 2** were used in furtherance of the attempted bringing in of aliens without presentation and for financial gain, and for aiding and abetting of illegal entries.  This phone and the devices were located in the area where Gomez-Espinoza and Medina-Espinoza piloted the boat.  Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the smuggling activities of Gomez-Espinoza, Medina-Espinoza and their co-conspirators, such as addresses, location and mapping data, pictures and other digital information are stored in the memory of **Target Phone 1** and **Target GPS Devices 1 and 2** described herein.

## **METHODOLOGY**

64.     It is not possible to determine, merely by knowing the cellular/mobile telephone's or GPS device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store

information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models and GPS devices using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

65. Following the issuance of these warrants, I will collect Target Phones 1 through 23 and Target GPS Devices 1 through 2 and subject them to analysis. All forensic analysis of the data contained within the telephones, memory cards and GPS devices will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

66. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

//

## CONCLUSION

67. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude **Target Phones 1 through 6** and **Target GPS Devices 1 through 2** were used to facilitate the criminal offenses identified herein by transmitting and storing data, specifically that described in Attachment B, which constitutes evidence of violations of: Title 8, United States Code, Section 1324(a)(2)(B)(ii) and Title 18, United States Code, Section 2 -- Attempted Bringing in Aliens for Financial Gain and Aiding and Abetting; Title 8, United States Code, Sections 1324(a)(1)(A)(i) and (v)(II) -- Attempted

1  Bringing In Aliens Without Presentation and Aiding and Abetting; Title 8, United States
2  Code, Sections 1324(a)(1)(A)(ii) and (v)(I) – Conspiracy to Transport Aliens in the United
3  States; and, Title 8, United States Code, Section § 1325(a)(1) and Title 18, United States
4  Code, Section 2 -- Attempted Improper Entry and Aiding and Abetting.  I also believe that
5  probable cause exists to believe that evidence, fruits and instrumentalities of illegal activity
6  committed by Gomez-Espinoza, Medina-Espinoza and their co-conspirators continues to
7  exist on **Target Phones 1 through 6** and **Target GPS Devices 1 and 2** as described in
8  Attachments A-1 through A-8 because the phones and GPS devices have been stored in a
9  secure location.  Therefore, I respectfully request that the Court issue these warrants.

11        I swear the foregoing is true and correct to the best of my knowledge and belief.

14        Roland V. Negal Jr.
        Border Patrol Agent Intelligence
15        U.S. Border Patrol

17  Subscribed and sworn to before me this ____5____ day of June, 2019.

20  _____
        The Honorable William V. Gallo
21  United States Magistrate Judge

## **ATTACHMENT A-7**

## PROPERTY TO BE SEARCHED

**Target GPS Device 1**

Garmin Nuvi GPS 1490
S/N: 1Q0062736
FPF#: 2019565100003501-0006

Currently in the possession of San Diego Sector Asset Forfeiture Office at the Chula Vista

Border Patrol Station, located at 311 Athey Ave, San Ysidro, California 92173.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search **Target Phones 1 through 6** and **Target GPS Devices 1 and 2** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Phones 1 through 6** and **Target GPS Devices 1 and 2** for evidence described below.  The seizure and search of **Target Phones 1 through 6** and **Target GPS Devices 1 and 2**, and will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from **Target Phone 1** and **Target GPS Devices 1 and 2** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data for the period from March 1, 2018 (when Jorge Luis Gomez-Espinoza, the pilot of a vessel with the smuggled aliens, claimed he began smuggling aliens for a human smuggling organization) through February 9, 2019 (the date after the apprehension).  The evidence to be seized from **Target Phones 2 through 6** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data for the period from January 1, 2019 (the approximate date that the majority of the smuggled aliens began their communications to be smuggled into the United States) through February 9, 2019 (the date after the apprehension).

a.  tending to identify the smuggling of undocumented aliens into the United States and then to the final destination within the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of undocumented aliens into the United States, or to their final destination within the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in the smuggling of undocumented aliens into the United States, or to their final destination within the United States;

     d.     tending to identify travel to or presence at locations such as stash houses, ports of call, launch bays, or delivery points involved in the smuggling of undocumented aliens into the United States, or to their final destination within the United States;

     e.     tending to identify the user of, or persons with control over or access to, the subject telephones or GPS devices; and/or

     f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above; and

     g.     tending to identify method, and manner of payment for smuggling of undocumented aliens into the United States, or to their final destination within the United States;

which are evidence of violations of: Title 8, United States Code, Section 1324(a)(2)(B)(ii) and Title 18, United States Code, Section 2 -- Attempted Bringing in Aliens for Financial Gain and Aiding and Abetting; Title 8, United States Code, Sections 1324(a)(1)(A)(i) and (v)(II) -- Attempted Bringing In Aliens Without Presentation and Aiding and Abetting; Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) – Conspiracy to Transport Aliens in the United States; and, Title 8, United States Code, Section § 1325(a)(1) and Title 18, United States Code, Section 2  -- Attempted Improper Entry and Aiding and Abetting.